UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Bankruptcy No. 15 B 36715 |
| ROBERT KEVIN MAXWELL, | ) | Chapter 13 |
| | ) | Judge Donald R. Cassling |
| Debtor. | ) | |
| | ) | |
| CHICAGO PATROLMEN'S | ) | |
| FEDERAL CREDIT UNION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 17 A 00480 |
| | ) | |
| ROBERT KEVIN MAXWELL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Debtor Robert Kevin Maxwell ("Debtor") received his discharge on July 5, 2016. One of his creditors, the Chicago Patrolmen's Federal Credit Union (the "Credit Union"), now seeks to revoke that discharge under 11 U.S.C. § 1328(e), based on Debtor's failure to amend his Schedules to disclose his receipt of a large litigation settlement during the bankruptcy. Because the Credit Union has failed to prove by a preponderance of the evidence that Debtor acted with fraudulent intent, the Court will not revoke Debtor's discharge.

## BACKGROUND

Debtor executed a note and mortgage in favor of the Credit Union on May 28, 2004 to finance his purchase of a home on 10723 South Longwood Drive, Chicago, Illinois (the "Property"). (Credit Union Ex. H.) Debtor has been a member of the Credit Union since 1990. (Trial Transcript ("Tr.") 12:18-21.)

On January 15, 2010, Debtor filed a complaint for employment discrimination against Cook County, Illinois. *Maxwell v. Cnty. of Cook*, No. 10-cv-00320 (N.D. Ill. filed Jan. 15, 2010), (the "Discrimination Lawsuit"). (Adv. Dkt. 31, p. 5, ¶ 2.) In his complaint, Debtor sought significant monetary damages.

Roughly five years after filing the Discrimination Lawsuit, Debtor filed his Chapter 13 bankruptcy petition on October 28, 2015. (Dkt. No. 1.) Debtor listed the Discrimination Lawsuit in his Schedules, but listed its value as unknown. (*Id.* at p. 10.) Debtor also listed the Property in his Schedules and valued it at $183,346.00, based on a valuation provided by Zillow.com. (*Id.* at p. 8.) Before bankruptcy, Debtor defaulted on the loan, and the Credit Union started foreclosure proceedings on the Property in state court. (Tr. 13:15-14:7.)

At the same time he filed his petition, Debtor submitted a proposed plan that required him to make sixty monthly payments of $421.00 for the benefit of all his unsecured creditors. His plan dealt with the Credit Union's claim by offering to surrender the Property to the Credit Union in full satisfaction of the Credit Union's claim (the "Chapter 13 Plan"). (Dkt. No. 2, pp. 2 & 5.)

Five days after he filed his bankruptcy case, Debtor and Cook County reached a tentative settlement agreement. (Adv. Dkt. 31, p. 5, ¶ 9.) In exchange for Debtor releasing his claim against Cook County, Cook County agreed to pay Debtor about $400,000.00 (the "Settlement"). (Credit Union Ex. F.) Debtor never amended his Schedules to reflect receipt of the Settlement. But he did tell both his bankruptcy attorney and the Chapter 13 Trustee about his receipt of the Settlement proceeds. (Tr. 48:8-16.)

On December 10, 2015, the Court granted stay relief to the Credit Union with regard to the Property. (Dkt. No. 21.) In its stay-relief motion, the Credit Union emphasized that Debtor had already agreed in the Chapter 13 Plan to surrender the Property. (Adv. Dkt. No. 31, p.6, ¶ 12.) In

2

further support of its motion, the Credit Union estimated the value of the Property at $183,346.00—a value about twice the $99,156.90 balance due on the note and mortgage. (*Id.* at ¶ 13.)

On December 31, 2015, the Court entered an order confirming the Chapter 13 Plan, (the "Confirmation Order"). (Dkt. No. 26.)[1]

Meanwhile, in the foreclosure proceedings, the Credit Union sold the Property at auction on April 4, 2016, for only $43,600.00, less than half the amount owed to the Credit Union and about one-quarter of the value estimated for the Property by the Credit Union in its motion to lift stay. (Credit Union Ex. D.) This auction sale left the Credit Union with an unexpected deficiency of $61,859.30. (*Id.*)

On January 26, 2016, Debtor and Cook County executed the Settlement. (Adv. Dkt. No. 31, p. 7, ¶ 26.) Once Debtor received the proceeds from the Settlement, he used those funds to pay the balance due under the Chapter 13 Plan, a balance which did not include the Credit Union's deficiency claim. (*Id.* at ¶¶ 21 & 25.)

On July 5, 2016, Debtor was granted a discharge. (Dkt. No. 37.) Based on the Chapter 13 Standing Trustee's Final Report and Account, $13,032.00 of unsecured claims were discharged without payment. (Credit Union Ex. G.)

On June 28, 2017, the Credit Union filed an emergency motion to reopen Debtor's case to file an adversary proceeding to revoke his discharge, claiming to have found out about Debtor's receipt of the Settlement on that same day. (Dkt. No. 46, p. 4, ¶ 6.)

The Credit Union filed this adversary proceeding on September 20, 2017. (Adv. Dkt. No.

---

[1] The Court notes that Debtor submitted an amended proposed Chapter 13 plan on November 24, 2015 that the Court confirmed on December 31, 2015. (Dkt. No. 24.) The Court amended that order—confirming Debtor's original proposed plan. (Dkt. No. 26.)

3

1.) After a long discovery process, the Court conducted a one-day trial and took the matter under advisement on January 23, 2019.

## DISCUSSION

The Credit Union seeks to revoke Debtor's discharge under 11 U.S.C. § 1328(e):

> On request of a party in interest before one year after a discharge under this section is granted, and after notice and a hearing, the court may revoke such discharge only if—
> (1) such discharge was obtained by the debtor through fraud; and
> (2) the requesting party did not know of such fraud until after such discharge was granted.

11 U.S.C. § 1328(e).[2]

Section § 1328(e) requires that the moving party establish three elements: "(1) the request for revocation of the discharge must be made within one year after a discharge is granted; (2) that the discharged was procured by the debtor through fraud; and (3) that the requesting party did not know of the fraud until after the discharge was granted." *Beskin v. Knupp (In re Knupp)*, 461 B.R. 351, 355 (Bankr. W.D. Va. 2011).

To prevail, the plaintiff must establish these elements by a preponderance of the evidence. *Id.* at 354 n.1 (relying on *Grogan v. Garner*, 498 U.S. 279 (1991)); *see Grochocinski v. Eckert (In re Eckert)*, 375 B.R. 474, 478 (Bankr. N.D. Ill. 2007), *aff'd*, No. 07 C 6012, 2008 WL 4547224 (N.D. Ill. Apr. 2, 2008) (stating that the burden of proof for Chapter 7's analogous provision under § 727(d)(1) is a preponderance of the evidence).

The Court has previously ruled that the Credit Union made its request to revoke Debtor's

---

[2] Section 1328(e) allows for any "party in interest" to seek revocation of a discharge. 11 U.S.C. § 1328(e). At trial, Debtor again argued that the Credit Union was not a "party in interest" and so lacked standing to pursue this complaint. (Tr. 8:10-9:2.) In a previous motion to dismiss, Debtor had raised the standing issue, and the Court ruled against him, concluding that the Credit Union was a "party in interest" in Debtor's bankruptcy case and therefore had standing. (Adv. Dkt. No. 12, pp. 3-4.) The Court declines to revisit this issue because Debtor has submitted no new argument. *See, e.g., Flynn v. FCA US LLC*, No. 15-CV-0855, 2017 WL 3592040, at *2 (S.D. Ill. Aug. 21, 2017) (relying on a previous order that ruled on standing issue). The Court therefore stands by its previous decision and holds that the Credit Union has standing to prosecute the adversary proceeding.

4

discharge within one year of the discharge order in its Order Denying Motion to Dismiss. (Adv. Dkt. No. 12, pp. 6-7.) So the Credit Union has satisfied element one. The Court must next determine whether the Credit Union established that Debtor procured his discharge through fraud.

To prove that a debtor procured the discharge through fraud, the movant must establish "(1) that the debtor knowingly and fraudulently committed an act or omission in connection with [their] bankruptcy proceeding; and (2) that the act or omission concerned a material fact." *Knupp*, 461 B.R. at 356.

While there is no binding authority from the Seventh Circuit applying § 1328(e), there is a sizeable body of Seventh Circuit caselaw analyzing Chapter 7's analogous provision—§ 727(d)(1). As stated in § 727(d)(1):

> On request of . . . a creditor, . . . and after notice and a hearing, the court shall revoke a discharge . . . if—
> (1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge[.]

11 U.S.C. § 727(d)(1).

"Where two statutes deal with the same subject matter, they are to be read *in pari materia*," *In re Johnson*, 787 F.2d 1179, 1181 (7th Cir. 1986), meaning that a court should read the two statutes as if they were one law, *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315-16 (2006). *See, e.g., In re Am. Trawler Corp.*, 24 B.R. 505, 507 (Bankr. D. Me. 1982) (applying *in pari materia* to § 327(a) and § 1103(a)). Other than the one-year limitation imposed in § 1328(e), both provisions address the same subject matter and operate in the same manner. Both provisions revoke a debtor's discharge if: (1) the debtor obtained the discharge through fraud; and (2) the moving party was unaware of the fraud until after the discharge occurred. *Compare* 11 U.S.C. § 727(d)(1) *with* 11 U.S.C. § 1328(e). The Court will therefore test for fraudulent intent under § 1328(e) using the same standards it would apply under § 727(d)(1), subject to one significant

5

caveat: The Court will not import the other grounds for revocation listed in § 727(d) into § 1328(e). Under § 1328(e), a court may revoke a debtor's discharge "only" for fraud. *See Cisneros v. United States (In re Cisneros)*, 994 F.2d 1462, 1465-66 (9th Cir. 1993).

Fraud under § 727(d)(1) (and thus § 1328(e)) means fraud "in fact." *Rezin v. Barr (In re Barr)*, 207 B.R. 160, 165 (Bankr. N.D. Ill. 1997). In other words, the Credit Union must show that Debtor acted with an intent to deceive. *State Bank of India v. Kaliana (In re Kaliana)*, 202 B.R. 600, 604 (Bankr. N.D. Ill. 1996).

The Seventh Circuit has described two sources for establishing fraud in fact: "The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct. Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances." *In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (internal citations omitted).

At trial, only two witnesses testified: Ray Davis and Debtor. (Adv. Dkt. No. 31, p. 8.) Ray Davis is the asset recovery manager at the Credit Union. (Tr. 11:15-17.) His job is to ensure that loans are paid on time to minimize losses. (*Id.* at 11:18-22.) Mr. Davis testified that the Credit Union applies standard operating procedures when a member files for bankruptcy. (*Id.* at 14:8-15.) First, if the Credit Union has already started foreclosure proceedings when a borrower files for bankruptcy, the Credit Union stops that proceeding immediately. (*Id.* at 14:11-20.) Then, the Credit Union determines what its member intends to do with the property in the bankruptcy and, based on that intention, determines a path to optimize the Credit Union's recovery. (*Id.* at 14:22-15:4.)

Here, Mr. Davis testified that the Credit Union decided to accept surrender of the Property in complete satisfaction of its claim against Debtor for two reasons: (1) the Credit Union believed that the value of the Property exceeded the balance owed on its loan; and (2) Debtor represented

to the Credit Union that he planned on retiring in June 2016, and would therefore not have funds available to pay any possible deficiency. (*See id.* at 17:12-17.) Mr. Davis testified "[w]e thought we would be covered by the value of the [P]roperty, so we weren't expecting to have a huge loss that we incurred." (*Id.* at 31:24-32:1.) While acknowledging that Debtor listed the Discrimination Lawsuit in his Schedules, Mr. Davis testified that Debtor never placed an estimated value of the Discrimination Lawsuit on his Schedules and failed to amend his Schedules to reflect his receipt of the Settlement proceeds. (*Id.* at 36:10-14.)

The Credit Union argues that Debtor's failure to amend his Schedules to reflect his receipt of the Settlement proceeds "speaks for itself" and, without more, proves that Debtor procured his discharge through fraud. (*Id.* at 59:8-12.) The problem with this argument is that it fails to establish that Debtor acted with the level of deceptive intent that is required in order to bar his discharge.

Based on the Court's observations at trial, the Court finds that Debtor was a credible and honest witness.[3] Debtor's demeanor was forthright, direct, and not evasive. While the Court acknowledges Debtor's self-interest, the Court did not detect dishonesty or embellishment by Debtor, nor did Debtor try to skew the facts in his favor. Indeed, the Court cannot point to an instance in which the Credit Union successfully impeached Debtor's credibility.

It is undisputed that Debtor listed the Discrimination Lawsuit on his Schedules, as is the fact that Mr. Davis of the Credit Union reviewed that entry when assessing the Credit Union's initial strategy in the bankruptcy case. (*Id.* at 22:20-23:21.)

---

[3] A trial court is in the best position to assess the credibility of the witnesses and weigh the evidence. *Anderson v. Bessemer City*, 470 U.S. 564, 574-75 (1985) (noting that deference is given to a trial court's findings that involve credibility of witnesses because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is stated). "'[T]he carriage, behavior, bearing, manner, and appearance of a witness-in short, his demeanor-is a part of the evidence.'" *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 87 (Bankr. N.D. Ill. 2002) (quoting *Dyer v. MacDougall*, 201 F.2d 265, 268 (2d Cir. 1952)).

The Court does not believe that the fact that Debtor listed the value at "unknown" supports a finding that he acted with fraudulent intent. Debtor testified credibly when he stated that, when he filed for bankruptcy, he had no way of knowing whether there was even a possibility of a settlement, much less how much money he could expect to receive from the Discrimination Lawsuit. (*Id.* at 53:1-7.) He stated that he pursued the litigation as a matter of principle, which the Court takes to mean that Debtor wanted a court to rule on the merits of the Discrimination Lawsuit. (*Id.* at 53:4-7.)

Debtor testified and admitted that he attended a hearing on the Discrimination Lawsuit in November 2015, where terms for the Settlement were discussed. (*Id* at 44:16-45:1.) Debtor testified, however, that the terms of the Settlement were not yet final. (*Id.* at 45:2-4.) Debtor testified that, for the Settlement to become final, the Sheriff of Cook County had to join in and approve the Settlement. (*Id.* at 45:2-16.)

Debtor further testified that Cook County and Debtor had previously engaged in three separate settlement conferences. Only one of those produced a tentative agreement, and the Sheriff rejected it. (*Id.* at 45:17-46:19.) Based on this history, Debtor testified that, while he hoped that the Sheriff would approve the Settlement after the settlement conference in November 2015, he could not be sure that the Sheriff would do so. (*Id.* at 46:20-47:3.)

The Credit Union argues that because the Discrimination Lawsuit was filed in 2010, Debtor must have had "a reasonable estimate in his mind" when he filed for bankruptcy in 2015. (*Id.* at 64:15-24.) The Court disagrees. The Credit Union never examined Debtor about his negotiation history with Cook County and the Sheriff. Nor did it examine him about the content of the previous settlement negotiations or the terms of the settlement offer rejected by the Sheriff. Nor did either party introduce evidence that would establish a typical timeframe for settlement negotiations for a

8

lawsuit analogous to the Discrimination Lawsuit. With no other evidence available to it, the Court finds that the length of the Discrimination Lawsuit alone does not establish whether Debtor could have placed a value on the Discrimination Lawsuit before it was executed.

In short, the Court finds that the Credit Union has not met its burden of proving by a preponderance of the evidence that Debtor's decision to label the Discrimination Lawsuit's value as "unknown" in his Schedules established an intent to deceive. Given the lack of success in the previous settlement negotiations and the Sheriff's rejection of a previous tentative settlement agreement, the Court finds that the decision to list the value of the Discrimination Lawsuit as "unknown" was instead honest and not deceitful. *See, e.g.*, *Sun Sec. Bank v. Rohe*, (*In re Rohe*), 460 B.R. 249, 253 (Bankr. E.D. Mo. 2011) (finding that a debtor's failure to list the value of an asset did not equate to fraud under § 727(d)(1)).

Next, the Court must address the Credit Union's strongest argument for revocation of Debtor's discharge: Debtor failed to amend his Schedules or notify his creditors after receiving the Settlement. It is undisputed that "[d]ebtors have a continuing duty to schedule newly acquired assets while the bankruptcy case is open. Although there is a trustee in a Chapter 13 bankruptcy, the trustee acts as an advisor and administrator while debtor remains in possession of the estate." *Rainey v. United Parcel Serv., Inc.*, 466 F. App'x 542, 544 (7th Cir. 2012) (internal citation omitted). "Debtors are personally responsible for the accuracy of the information contained in their schedules whether or not they have been assisted by counsel." *In re Stone*, 504 B.R. 908, 913 (Bankr. C.D. Ill. 2014).

But does Debtor's failure to amend his Schedules to reflect receipt of the Settlement necessarily equate to fraud by Debtor? Under § 1328(e), that depends on Debtor's intent.

9

Debtor testified that his bankruptcy attorney told him to contact him once Debtor received the Settlement. (Tr. 53:8-17.) Debtor interpreted this request to mean that he should notify his attorney only after he received the funds from the Settlement, given the parties' multiple prior unsuccessful settlement negotiations. (*Id.* at 53:13:23.) Debtor testified that the Sheriff approved the Settlement sometime in January 2016 and that he received the Settlement funds sometime in April 2016. (*Id.* at 47:4-11, 48:3-7.) Although Debtor could not recall the exact day he paid off his case, he testified that it occurred shortly after receiving the check. (*Id.* at 58:8-18.)

Significantly for determining Debtor's intent, he testified that he notified both his bankruptcy attorney and the Chapter 13 Trustee about receiving the Settlement. (*Id.* at 48:8-16.) He also testified that he did not direct his Discrimination Lawsuit attorney or bankruptcy attorney to hide information about the Settlement from the Credit Union or any other creditor. (*Id.* at 50:16-24.)

The Credit Union argues that Debtor's failure to amend his Schedules "speaks for itself" in establishing that Debtor acted with an intent to deceive. (*Id.* at 59:8-13.) The Court disagrees.

Debtor's failure to amend his Schedules did violate his affirmative duty to report new assets received during his bankruptcy. *See Rainey*, 466 F. App'x at 544. But the Credit Union has failed to show that this violation originated from Debtor's intent to deceive his creditors, and it is proof of that intent that is missing from the Credit Union's presentation.

While Debtor did not amend his Schedules, it is uncontroverted that Debtor did reveal the Settlement to both his attorney and the Chapter 13 Trustee. (Tr. 48:8-16.) Those two disclosures contradict the Credit Union's argument that Debtor acted with an intent to deceive his creditors when he failed to update his Schedules to reveal his receipt of the Settlement proceeds. If Debtor intended to conceal the Settlement and deceive his creditors, Debtor would not have disclosed it

to his own attorney, much less to the Chapter 13 Trustee. Debtor's failure to amend his Schedules to list the actual amount of Settlement proceeds received is certainly troubling to the Court and might justify relief of a different nature, but that failure has not established that Debtor acted with fraudulent intent under § 1328(e). Without proof of fraudulent intent, the Credit Union cannot have Debtor's discharge revoked.

In short, the Credit Union failed to establish that Debtor procured his discharge through fraud. Because the final element of § 1328(e) also requires a finding of fraud, the Court will not address it.[4]

## CONCLUSION

For the reasons stated above, the Court will not revoke Debtor's discharge.

**ENTERED:**

**DATE: March 6, 2019**

*Donald R. Cassling*
_____
**Donald R. Cassling**
**United States Bankruptcy Judge**

---

[4] Even if the Credit Union succeeded in this adversary proceeding, the Court notes that revoking Debtor's discharge would not alone revive the Credit Union's deficiency claim. The Credit Union would still have to revoke the Confirmation Order that extinguished the Credit Union's claim upon Debtor surrendering the Property. Indeed, the Court points to § 1330(a), which provides "[o]n request of a party in interest at any time within 180 days after the date of the entry of an order of confirmation . . . and after notice and a hearing, the court may revoke such order if such order was procured by fraud." 11 U.S.C. § 1330(a); *In re Swanson*, 312 B.R. 153, 158 (Bankr. N.D. Ill. 2004) ("A confirmation order may be revoked or vacated only for fraud . . . ."). The time to file such a complaint has long since passed. The Court, however, does not believe that the Credit Union would have been out of bases for relief. For example, it would have been possible, though difficult, that the Credit Union could have revoked the Confirmation Order under Federal Rule of Civil Procedure 60(b), made applicable by Fed. R. Bankr. P 9024, but only if the Credit Union could have established that it had been "deprived of a constitutional right." *Swanson*, 312 B.R. at 158.